**UNITED STATES, Appellee,**

v.

**Captain Brenda F. BABBITT, 560–92–7569, United States Army, Appellant.**

**CM 444459.**

U.S. Army Court of Military Review.

29 May 1986.

velle, JAGC, Lieutenant Colonel Thomas M. Curtis, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Captain Samuel J. Rob, JAGC (on brief).

Before WOLD, FELDER, and NAUGHTON, Appellate Military Judges.

OPINION OF THE COURT

WOLD, Senior Judge:

During the early evening hours of 9 November 1982, appellant shot Captain B in the chest with a .38 caliber pistol. Approximately twenty minutes later, medical authorities were notified that assistance was needed. Captain B ultimately recovered from his injuries. Appellant was charged with attempted murder, pled not guilty, and was convicted by the members of a general courtmartial as charged. She was sentenced to dismissal, confinement for ten years, and forfeiture of $1000.00 pay per month for 120 months. The convening authority reduced the confinement and the forfeitures to five years.

Captain B's testimony can be summarized as follows. He and appellant met, courted, and became engaged to be married during the eight months preceeding the shooting. During part of this period, including several weeks when Captain B was living in appellant's apartment, they engaged in sexual intercourse, usually at appellant's insistence. A few days prior to the shooting, however, Captain B broke the engagement. Appellant then arranged for Captain B to come to her apartment, ostensibly to return some of her belongings. When he arrived, she said she had a surprise for him and asked him to close his eyes. The next thing he recalled was a muzzle flash and the impact of the bullet entering his chest. Appellant then told Captain B that if she could not have him, no one could. Appellant declined to summon assistance, despite Captain B's entreaties, until he had repeatedly assured her that he would say the shooting was an accident. In the interim, appellant telephoned two of her friends and rehearsed

For Appellant: Vaughan E. Taylor, Esquire, Captain Michael E. Graham, JAGC (argued); George Martin Kripner, Esquire, Colonel William G. Eckhardt, JAGC, Lieutenant Colonel William P. Heaston, JAGC, Major Harry L. Williams, Jr., (on brief).

For Appellee: Captain Michael W. Hoadley, JAGC (argued); Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gra-

with each of them the story that she had thought she was shooting a prowler.

The government also produced evidence that the pistol with which Captain B was shot had been purchased by appellant the day of the shooting and that later that afternoon appellant had called Captain B at his company headquarters.

Appellant also testified, in summary as follows. During the ten months before the shooting, she was pursued and courted by Captain B. She accepted his proposal of marriage only because she felt sorry for him and never engaged in sexual intercourse with him voluntarily. Instead, while Captain B was courting her, appellant was falling in love with a co-worker, Sergeant First Class G. During this period appellant encountered serious difficulties in her work. In order to vent her frustrations, she composed (but never sent) a letter, referred to as the "Soviet letter," offering her services to the Soviet Union. Captain B found this letter and, by threatening to reveal it, forced appellant to pay his bills and submit to sexual intercourse with him. Appellant was able to retrieve this letter from Captain B's office a few days before the shooting. At about the same time, appellant became aware of suspicious youths loitering in her neighborhood and entering her automobile. She purchased the pistol for protection and to use for target practice. On the night of the shooting, appellant was awakened in the dark by the presence of a figure in her bedroom. Believing it was a prowler, she fired the pistol. Although she intended only to frighten the intruder, the shot struck him. The intruder turned out to be Captain B. Appellant then fainted, hysterically tried to summon help on the telephone, fainted again, and was again on the telephone trying to summon help when the authorities arrived.

Both parties produced several witnesses to corroborate various portions of the testimony of the protagonists.

Appellant primarily attacks her conviction on the ground that she was deprived of the effective assistance of counsel, both by deficient representation and by a conflict of interest. Both parties have provided the court with a very large number of briefs and appellate exhibits. The court has also heard several oral arguments on various aspects of the case.

■ Appellant has requested that we order an evidentiary hearing [1] to inquire into her assertions. Although military case law recognizes that such hearings can be useful in cases involving the issue of ineffective assistance of counsel, *see United States v. Perez*, 39 C.M.R. 24 (C.M.A.1968); *United States v. Zuis*, 49 C.M.R. 150 (A.C.M.R.1974), we do not believe that this case warrants such action. As noted above, both parties have filed numerous appellate exhibits and affidavits. Appellant has submitted several personal statements for our consideration and the two key trial defense counsel, including the lead counsel, Mr. Edward J. Bellen, have submitted lengthy, detailed affidavits regarding their representation of appellant. While some contradictory assertions remain, our examination of these submissions indicates that the residual contradictions are of a minor nature and that their resolution at an evidentiary hearing would have no effect on our resolution of the issues in this case. The affidavits and exhibits we now have provide us with ample information for determining precisely what transpired; there is more than enough, in fact, to make an evidentiary hearing superfluous. Accordingly, we deny appellant's motion for an evidentiary hearing and proceed to the merits.

Appellant asserts that several aspects of her counsels' representation were deficient in the sense of falling below the level of "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). These are essentially attacks on her counsels' trial tactics. They include three instances of the defense team's failure to present certain evidence to corroborate appellant's tes-

---

1. *See United States v. DuBay,* 37 C.M.R. 411 (C.M.A.1967).

timony;[2] failure to raise the issue of adverse pretrial publicity;[3] failure to present a defense on psychiatric grounds; failure to present a case on extenuation or mitigation; and the decision of the defense to present evidence of the alleged blackmail of appellant by Captain B, including evidence of the "Soviet letter" allegedly written by appellant.[4]

■ Concerning mental responsibility, appellant asserts that her counsel should have raised the defense of impaired ability to form the specific intent to kill. Appellant was examined by several psychiatric experts. All agreed that she was competent to stand trial and that neither her capacity to appreciate the criminality of her actions nor her capacity to conform her actions to the requirements of the law were impaired in any substantial way. There was also general agreement that she had a histrionic personality. Based on this diagnosis, a government-employed psychologist opined that appellant's "[a]bility to plan appeared significantly impaired because of the massive amount of stress, and other factors [appellant] experienced prior to the alledged [sic] offense." However, there were at least two government experts who were prepared to dispute this conclusion. In addition, the defense expert, a distinguished forensic psychiatrist, had pointed out in his report to the defense team that two of the distinguishing features of a histrionic personality are manipulativeness and a propensity for exaggeration.[5] In appellant's case, he said, her personality disorder made her a "pathological liar." In response to appellant's allegation, Mr. Bellen has stated that he felt that the potential damage to appellant's chances for acquittal far outweighed the possible benefits to be gained from raising the issue. Since the essence of the case was whether appellant's or Captain B's version of the shooting would be believed, that decision was well within the bounds of reasonable tactical judgment. *United States v. Rivas*, 3 M.J. 282, 288–89 (C.M.A.1977). As such, it will not be second-guessed on appeal.[6]

---

2. With respect to these matters, appellant also alleges failure to locate and interview prospective witnesses. Since the relevance of any such failure would be a resulting failure to present their testimony, these allegations are subsumed within the allegations stated above.

3. This issue is plainly without merit. Appellant has failed to show that her case generated any pretrial publicity which merited any action by counsel or anyone else.

4. Appellant also alleges that one of her military counsel improperly expended funds she had entrusted to him and failed to account for funds she had entrusted to him. This allegation is irrelevant to the validity of appellant's conviction, and, in any event, lacks substantial foundation. Finally, appellant complains that Mr. Bellen violated ethical constraints by taking her case for the purpose of including it in future legal seminars. *See* Disciplinary Rules 5–101, 5–104(B), American Bar Association Model Code of Professional Responsibility; *cf. United States v. Hearst*, 466 F.Supp. 1068 (N.D.Cal. 1978), *aff'd in part and vacated in part*, 638 F.2d 1190 (9th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *People v. Corona*, 80 Cal.App.3d 684, 145 Cal.Rptr. 894 (1978). Even if true, this assertion is irrelevant, since we find that any such motive, if it existed, did not result in an actual conflicting interest and had no adverse effect on the quality of Mr. Bellen's representation in this case. *See Cuyler*

*v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.").

5. *See generally* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 313 (3d Ed. 1980).

6. Mr. Bellen has also stated that, since the core of the defense theory was self-defense followed by accident, he felt it imperative to avoid evidence which would show appellant's judgment to be seriously flawed, as would evidence of a histrionic personality. Appellant counters that the defense of self-defense in this case required only an honest belief that the force used was necessary, not an honest and reasonable belief, and, therefore, that the decision to eschew the psychiatric evidence was a professional blunder. In this connection, appellant points to the fact that the trial judge *sua sponte* instructed the members that appellant need only have honestly believed that the force she used was necessary. In our view, however, the military judge's instruction was incorrect under the law prevailing at the time of appellant's trial. *See United States v. Regalado*, 33 C.M.R. 12, 14–16 (C.M.A. 1963) (individuals may protect their place of abode against unlawful intrusion, but may only

■ We reach similar conclusions regarding appellant's claim that her attorneys lost critical corroboration evidence and failed to interview corroboration witnesses. Regarding the lost evidence, appellant's checkbook, we accept trial defense counsel's statement that he had no recollection of any such item. Moreover, even if we were to assume this evidence was lost by trial defense counsel, we find no prejudice to appellant. Her argument is that various entries in this checkbook would have corroborated her story that she was being blackmailed by Captain B. However, since ample evidence of this type was presented at trial, the checkbook would have been cumulative evidence if offered. As to the corroboration witnesses, counsel's affidavits establish that they were interviewed but that counsel made a tactical decision not to call them to testify. Based on our review of the entire record, we find this decision to be a reasonable tactical judgment. We also find no lapse of adequate representation in the trial defense team's decision to forego presentation of a case in extenuation and mitigation. In their professional judgment, this would have opened the door to extensive rebuttal in the form of bad character evidence. Again, our examination of the record and allied papers convinces us that this was an eminently reasonable decision.

■ We next turn to the decision to elicit testimony from appellant that she was being blackmailed by Captain B based on the "Soviet letter." Mr. Bellen's affidavit addressing appellant's accusations of inadequate representation can be fairly described as a defense of the quality of his representation of appellant. In his affidavit, he asserts that the testimony given by appellant at trial was what she had told him was the truth in their pretrial interviews. Mr. Bellen makes the point that his choice was to have appellant testify truth-

fully or not at all; that is, he did not have the option of coaching his client to testify untruthfully even though that course of action might have produced more plausible testimony and a more effective defense. Appellant of course maintained at trial that her testimony was truthful and has continued to maintain that position on appeal. While we are not required to agree with appellant that her testimony represents the objective truth of the matters addressed, or even that she believed that her testimony was true, we have no basis for questioning the proposition advanced by Mr. Bellen that appellant told *him* that her testimony was the truth. Consequently, we agree that he had to build his defense around her assertions or forgo her testimony.

In short, Mr. Bellen cannot be faulted for failing to obtain a more persuasive story from appellant. However, that is exactly what we would be doing if we accepted appellant's argument that Mr. Bellen was unreasonable in eliciting testimony pertaining to the "Soviet letter." The disclosure of the existence of this letter was very likely once appellant took the stand and, in Mr. Bellen's professional judgment, it was imperative that appellant take the stand and give her version of what happened if she was to have any chance of attaining her overriding goal, an acquittal. Thus, we conclude that Mr. Bellen's decision to elicit this admittedly damaging testimony in order to forestall the shock effect of its likely discovery during cross-examination was a reasonable tactical decision under the circumstances.

The second variety of deprivation claimed by appellant is that Mr. Bellen was laboring under a conflict of interest. The pertinent standard was set forth in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *United States v. Kidwell*, 20 M.J. 1020 (A.C.M.R.1985). It is as follows:

---

use such force as is reasonably necessary for that purpose); *see also* 40 Am.Jur.2d § 167 and cases cited therein. In essence, the so-called defense of habitation is basically a defense of self-defense, and as such requires both honest and reasonable beliefs on the part of an ac-

cused. Paragraph 216c, Manual for Courts-Martial, United States, 1969 (Rev. ed.) Consequently, we cannot fault trial defense counsel for failing to foresee what was essentially an instructional error (albeit a favorable one for appellant) by the military judge.

In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. In *Glasser v. United States,* [315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)], for example, ... [s]ince [an] actual conflict of interest impaired Glasser's defense, the Court reversed his conviction.

*Dukes v. Warden,* 406 U.S. 250 [92 S.Ct. 1551, 32 L.Ed.2d 45] (1972), presented a contrasting situation.... Since Dukes did not identify an actual lapse in representation, we affirmed the denial of habeas corpus relief.

... Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. See *Holloway [v. Arkansas,* 435 U.S. 475, 487–491, 98 S.Ct. 1173, 1180–1182, 55 L.Ed.2d 426 (1978)]. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. See *Glasser, supra,* [315 U.S.] at 72–75 [62 S.Ct. at 465–67].

... We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.

446 U.S. at 348–50, 100 S.Ct. at 1718–19 (footnotes omitted).

This issue arises out of Mr. Bellen's admitted emotional involvement with appellant, which culminated in sexual intercourse with her on the eve of the last day of her trial. The situation has generated much heated rhetoric, including eloquent denunciation of Mr. Bellen's sexual intercourse with his client on ethical grounds. What is missing, however, is a basis for concluding that Mr. Bellen's involvement with his client created an interest which was in conflict with his duty to defend her case.

■ Appellant's arguments ultimately boil down to the proposition that an attorney's sexual relations with his client *per se* create an actual conflict of interest which violates the client's Sixth Amendment right to effective assistance of counsel. We cannot accept this proposition. Although we certainly do not condone Mr. Bellen's conduct, we are not prepared to say that the Sixth Amendment and the Sixth Commandment are coextensive.[7]

While we recognize that conflicts of interest need not involve multiple representation, *United States v. Kidwell, supra,* the conflict must be actual rather than potential, which is to say that it must adversely affect the lawyer's performance, *Cuyler v. Sullivan, supra.* Here, there has been no showing that the relationship created a situation in which Mr. Bellen was actively representing conflicting interests. Moreover, our examination of the record indicates that it did not. Mr. Bellen's cross-examination of Captain B and the other prosecution witnesses was extensive. The case was fought out at every level, with each side contesting every detail which might affect the members' deliberations. This was particularly evident during the defense case, the best example being appellant's testimony, which was internally consistent and disputed every material aspect of the case against her. She and Mr. Bellen had obviously prepared extensively for the ordeal. In sum, the evidence points to the conclusion that Mr. Bellen's preparation and presentation of his client's defense

---

7. Such behavior can, of course, be a proper subject for professional discipline. The cases appellant has submitted on this point involve the administration of professional discipline against attorneys who had engaged in sexual relations with clients during the course of representation. *See e.g., Matter of Wood,* 265 Ind. 616, 358 N.E.2d 128 (1976); *Committee on Professional Ethics v. Durham,* 279 N.W.2d 280 (Iowa 1979). Since this court does not sit to review the ethical wrongdoing of counsel, we deem those cases inapposite to the Sixth Amendment issue now before us.

was, if anything, spurred on by his relationship with appellant.

We hold that appellant was not denied the effective assistance of counsel. The tactical decisions made by her counsel fell well within the range of competence demanded of attorneys in criminal cases. *McMann v. Richardson*, 397 U.S. 759, 770–71, 90 S.Ct. 1441, 1448–49, 25 L.Ed.2d 763 (1970). In addition, we find no actual conflict of interest generated by Mr. Bellen's intimate relations with appellant and no corresponding adverse effect on the quality of representation rendered at trial.

Appellant's other assignments of error relate to an alleged instructional deficiency, disqualification of the staff judge advocate and an invalid pretrial advice, failure of the trial judge to release appellant from pretrial confinement, insufficiency of the evidence to support the conviction, and cumulative error. We have considered these contentions and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge FELDER and Judge NAUGHTON concur.